**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **GLASCO WILLIAMS, III** : | |
| **AIS # 240019** : | |
| : | |
| **Petitioner,** : | |
| : | |
| **v.** : | **CIVIL ACTION NO. 09-00670-CG-B** |
| : | |
| **GRANTT CULLIVER,** : | |
| : | |
| **Respondent.** : | |

## REPORT AND RECOMMENDATION

Glasco Williams, III, a state prisoner currently in the custody of Respondent, has petitioned this Court for federal habeas corpus relief pursuant to 28 U.S.C. § 2254. Williams challenges the validity of his 2005 conviction in the Circuit Court of Mobile County, Alabama, for capital murder. He was sentenced to life without parole. (Doc. 1 at 2; Doc. 11, Att. 1 at 15-16).

This matter is now before the undersigned Magistrate Judge on Williams' Petition, Respondent's Answer, Williams' Reply, Williams' Amended Petition, Respondent's Supplemental Response, exhibits filed by the parties, and the state court records. Following a careful review of the petition and record, the

undersigned finds that an evidentiary hearing is not warranted

on the issues.[1]  See 28 U.S.C. § 2254(e)(2).

## **FINDINGS OF FACT**

The Alabama Court of Criminal Appeals found the facts of

this case to be as follows:[2]

---

[1]Because Petitioner filed his federal habeas petition after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). "AEDPA expressly limits the extent to which hearings are permissible, not merely the extent to which they are required." Kelley v. Secretary for Dep't of Corrs., 377 F.3d 1317, 1337 (11th Cir. 2004). The legal standard for determining when an evidentiary hearing in a habeas corpus case is allowed is articulated in 28 U.S.C. § 2254(e)(2), which provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
>
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Williams has failed to establish that an evidentiary hearing is warranted in this case.

Glasco Williams, III, appeals from his convictions on two counts of capital murder, violations of § 13A-5-40(a)(2) and (9), Ala. Code 1975. The jury recommended by a vote of 7-5 that Williams be sentenced to life imprisonment without parole. The trial court accepted the jury's recommendation and sentenced Williams to life imprisonment without parole.

The State's evidence at trial indicated that on May 13, 2003, Mamie Ervin, the victim, was killed in her home in Mobile, Alabama. Ervin was 73 years' old at the time of her death. The testimony indicated that she had suffered a debilitating stroke approximately one year before her death that had limited her ability to drive, resulting in her becoming reliant on her friends and family members to assist her with her errands. William's brother had helped drive Ervin on errands for approximately six months, and for approximately two weeks prior to Ervin's death, Williams had also helped drive Ervin on her errands.

The testimony indicated that on the day she died, Ervin had awakened feeling sick so she telephoned her doctor and requested a prescription. Ervin also spoke with several friends and family members that morning and told them that she was not feeling well. Billy Jordan, Ervin's son, testified that he went to Ervin's house sometime between 10:00 a.m. and 11:00 a.m. that morning to take her to the doctor. According to Billy, when he

---

[2] AEDPA directs that a presumption of correctness be afforded factual findings of state courts, "which may be rebutted only by clear and convincing evidence." Bui v. Haley, 321 F.3d 1304, 1312 (11th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). "This presumption of correctness applies equally to factual determinations made by state trial and appellate courts." Id. (citing Sumner v. Mata, 449 U.S. 539, 547 (1981)).

arrived, Ervin told him he did not have to drive her because Williams was present and had offered to take her to the doctor. Billy stated that he stayed for 10-15 minutes and then left Ervin's house, and that, when he left, Ervin and Williams were the only two people present.

Earline Stallworth testified that she lived in her parents' house across the street and one house down from Ervin's house. According to Stallworth, she was in the backyard tending to her flowerbed when she saw a man running down the railroad tracks. She stated that she recognized the man but that he appeared to be attempting to hide his face by looking away from her. Stallworth further stated that he had on a red shirt and that his hands were clenched and his pockets were bulging. Stallworth stated that, after he passed by, she walked to the front of her home and noticed fire coming from Ervin's house; she also testified that she then noticed Ervin's grandson and his girlfriend yelling for Ervin and trying to use a water hose to put out the fire. According to Stallworth, it had been approximately one minute from the time she saw Williams running away on the railroad tracks until the time she saw the fire at Ervin's house. Stallworth further testified that she told officers at the scene about seeing someone running down the railroad tracks at the onset of the fire. According to Stallworth, she then rode around with officers to locate the man she saw on the railroad tracks. Stallworth further testified that she and the officer soon encountered Williams, who she identified to the police as the man she saw running behind her house; she stated that he was wearing a different shirt than the red shirt she had seen him wearing shortly before she discovered Ervin's house ablaze.

Melvin Douglas, Ervin's grandson, testified that he lived behind his grandmother's home

and that he and his girlfriend were driving to his house at approximately 11:40-11:45 a.m., when he noticed smoke coming from Ervin's house. He stated that he began knocking on her windows and attempted to pull the burglar bars off her windows to gain entry to make sure she was not inside. Melvin testified that he was unable to gain entry or locate his grandmother, so he attempted to use a garden hose to control the fire until the fire department arrived a few minutes later.

Lonnie Douglas, another of Ervin's grandchildren, testified he and a coworker observed Williams walking down the street around noon wearing a red shirt, and that the location where they saw Williams was about a 15-minute walk from Ervin's house.

The State's evidence further indicated that firefighters arrived at the scene of the fire, gained entry into the house, and discovered Ervin on the floor in the living room. Ervin died en route to the hospital. Expert testimony excluded any possible accidental or natural causes of the fire and instead indicated that the fire had been intentionally set by someone. The evidence indicated that Ervin had been struck repeatedly in the head with a solid object causing numerous injuries—her skull was fractured in several places and bone fragments and brain tissue were protruding from some of her wounds. The autopsy indicated that Ervin died as a result of multiple blunt force injuries to her head and smoke inhalation and burns. Officers executed a search warrant at Williams's home shortly after the discovery of the body and located a red shirt in the washing machine. Finally, forensic evidence indicated that three droplets of blood that were consistent with Ervin's DNA profile were discovered on Williams's pants.

(Doc. 6, Att. 2 at 1-6) (footnotes omitted).

5

On January 24, 2005, jury trial proceedings began in the Circuit Court of Mobile County, Alabama, and on February 2, 2005, Petitioner was convicted of two counts of capital murder for beating to death, robbing, and setting afire the home of 73-year-old Mamie Ervin. (Doc. 6, Att. 8 at 11-12). Petitioner then filed a Notice of Appeal with the Alabama Court of Criminal Appeals. The Alabama Court of Criminal Appeals affirmed his convictions on April 21, 2006 in an unpublished memorandum opinion. (Doc. 6, Att. 8 at 12; Doc. 6, Att. 2). On May 26, 2006, the court overruled Williams' application for rehearing. (Doc. 6, Att. 4). Williams then filed a petition for a writ of certiorari with the Alabama Supreme Court. On October 13, 2006, the Alabama Supreme Court denied the writ, and issued a certificate of judgment. (Doc. 6, Att. 6).

On September 25, 2007, Williams filed a petition for post-conviction relief, pro se, pursuant to Rule 32 of the Alabama Rules of Criminal Procedure. (Doc. 6, Att. 8 at 14, 19-64). On January 4, 2008, the court denied the petition, and Williams appealed the denial to the Alabama Court of Criminal Appeals on February 15, 2008. (Doc. 6, Att. 8 at 15). On February 12, 2009, the Alabama Court of Criminal Appeals remanded the case to the Circuit Court with instructions "to make specific, written findings of fact concerning each of the appellant's ineffective-assistance-of-counsel allegations." (Doc. 6, Att. 10). On

March 23, 2009, the Circuit Court of Mobile County dismissed Williams' Rule 32 petition as being without merit, and issued a detailed opinion containing its findings. (Doc. 6, Att. 11 at 62-75). On May 22, 2009, the Alabama Court of Criminal Appeals affirmed the Circuit Court's denial of Williams' Rule 32 petition.[3] (Doc. 6, Att. 12). It appears that Williams filed

---

[3] In its order, the Alabama Court of Criminal Appeals affirmed the trial court's denial of Williams' Rule 32 petition, and stated as follows:

> In his petition, the appellant raised ineffective-assistance-of-counsel allegations with regard to his trial and appellate counsel. In an order dated February 12, 2009, we remanded this case to the circuit court for that court to make specific, written findings of fact concerning each of the appellant's ineffective-assistance-of-counsel allegations. On March 27, 2009, the circuit court submitted the record on remand to this court.
>
> On remand, the State submitted an amended response to the petition, including affidavits from the appellant's trial and appellant counsel and various documents related to the trial. After considering the petition and the State's amended response, the circuit court entered an order in which it thoroughly addressed each of the appellant's ineffective-assistance allegations. We adopt the circuit court's findings of fact as to each of the appellant's allegations and attach a copy of the circuit court's order to this memorandum. Based on the circuit court's findings, the appellant was not entitled to relief as to his ineffective-assistance-of-

(Continued)

an application for rehearing on June 19, 2009. (Doc. 6, Att. 13). The Alabama Court of Criminal Appeals issued a Certificate of Judgment on July 15, 2009. In the Certificate, the Court noted that the case was affirmed on return from remand and that the judgment was now final. (Doc. 6, Att. 14). Williams did not file a writ of certiorari with the Alabama Supreme Court.

On October 13, 2009, Williams filed the instant petition for habeas corpus relief. He set forth the following two claims in support of his request for habeas relief: (1) his "non-Miranda" statement should have been suppressed ("Claim One"); and (2) that the motion to suppress evidence obtained as a result of the search warrant issued on May 13 should have been granted ("Claim Two"). (Doc. 1 at 14-17). On December 15, 2009, Respondent filed a Response to the petition and, on December 30, 2009, Williams filed a Motion for Discovery, which was denied by this Court on April 5, 2010. (Docs. 6, 7, 10).

On January 5, 2010, Williams filed a Motion to Amend his petition, and set forth the following thirteen additional claims: (1) Petitioner was denied Due Process and a Fundamental

_____

> counsel allegations. Therefore, the circuit
> court properly denied his petition, see Rule
> 32.7(d), Ala. R. Crim. P., and we affirm the
> circuit court's judgment.

(Doc. 6, Att. 12 at 2).

Fair Trial because he was convicted based on insufficient evidence ("Claim Three"); (2) Petitioner was denied his Sixth Amendment right to effective assistance of counsel by his counsel's failure to provide a DNA expert at trial to assist him in his defense ("Claim Four"); (3) Petitioner was denied his Sixth Amendment right to effective assistance of counsel because he was denied the right to conduct his own defense ("Claim Five"); (4) Petitioner was denied his Sixth Amendment right to effective assistance of counsel by his counsel's failure to object to the admission of evidence seized from Petitioner in violation of his Fourth Amendment rights ("Claim Six"); (5) Petitioner was denied his Sixth Amendment right to effective assistance of counsel when his counsel failed to present evidence in support of a challenge to the venire not representing a fair cross section of the community ("Claim Seven"); (6) Petitioner was denied his Sixth Amendment right to effective assistance of counsel by his counsel's failure to ask the trial court to give a jury instruction regarding a break in the chain of custody of the DNA evidence ("Claim Eight"); (7) Petitioner was denied his Sixth Amendment right to effective assistance of counsel because counsel denied him the right to testify during his trial ("Claim Nine"); (8) Petitioner was denied his Sixth Amendment right to effective assistance of counsel when counsel failed to object to the in-court

identification of Petitioner by witness Earline Stallworth on the grounds that it stemmed from a suggestive out-of-court identification ("Claim Ten"); (9) Petitioner was denied his Sixth Amendment right to effective assistance of appellate counsel based upon counsel's failure to raise on direct appeal the trial court's giving of an erroneous jury instruction ("Claim Eleven"); (10) Petitioner was denied his right to effective assistance of appellate counsel when counsel failed to raise on direct appeal Petitioner's objection to the prosecutor's use of its preemptory strikes in a discriminatory manner to remove members of the Petitioner's race in violation of Batson v. Kentucky ("Claim Twelve"); (11) Petitioner was denied his Sixth and Fourteenth Amendment rights to effective assistance of appellate counsel when counsel failed to raise for direct appellate review Petitioner's request for a mistrial based on the State's violation of Brady v. Maryland ("Claim Thirteen"); (12) Petitioner was denied his Sixth and Fourteenth Amendment right to effective assistance of appellate counsel when counsel failed to raise for direct appellate review Petitioner's challenge to the admission of the blood spatter evidence ("Claim Fourteen"); and (13) Petitioner was denied his Sixth and Fourteenth Amendment right to effective appellate counsel when his counsel failed to raise for direct appellate review Petitioner's request for a mistrial based on the

introduction of inflammatory and prejudicial photographs ("Claim Fifteen"). (Doc. 8).

On January 20, 2010, Williams also filed a Reply to Respondent's Response to the habeas petition. (Doc. 9). On April 30, 2010, Respondent filed a Supplemental Response, along with additional exhibits, and denies that Williams is entitled to habeas corpus relief on any of his claims. (Doc. 11).

## DISCUSSION

Following a careful review of Williams' petitions, the undersigned finds, for the reasons set forth below, that Petitioner is not entitled to habeas relief on the basis of any of his claims.

### I. Original Petition Claims 1 and 2.

In his first petition, Williams argues that he entitled to relief under § 2254 because his "non-Miranda" statement should have been suppressed. (Doc. 1 at 14-16). He also argues that his constitutional rights were violated by the trial court's failure to suppress evidence obtained from an unlawful search. (Id. at 17). Respondent asserts that both claims one and two involve state law issues which were raised and denied on the merits in the state court.

28 U.S.C. § 2254(d) provides that:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court

shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

>    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

>    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id. In Williams v. Taylor, 529 U.S. 362, 412 (2000), Justice O'Connor, writing for a majority of the Court, recognized that "§ 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court."

>    A state-court decision is contrary to the Supreme Court's clearly established precedent (1) if the state court applies a rule that contradicts the governing law as set forth in Supreme Court case law, or (2) if the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. See Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 1519-20, 146 L. Ed. 2d 389 (2000).

>    A state court decision involves an unreasonable application of Supreme Court precedent "if the state court identifies the

> correct governing legal rule from [Supreme
> Court] cases but unreasonably applies it to
> the facts of the particular state prisoner's
> case." Williams, 120 S. Ct. at 1520. In
> addition, a state court decision involves an
> unreasonable application of Supreme Court
> precedent "if the state court either
> unreasonably extends a legal principle from
> [Supreme Court] precedent to a new context
> where it should not apply or unreasonably
> refuses to extend that principle to a new
> context where it should apply." Id.

Bottoson v. Moore, 234 F.3d 526, 531 (11th Cir. 2000).

Moreover, the Act, as amended, presumes as correct all determinations of factual issues made by a state court and places the burden upon the petitioner of rebutting such a presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e).

In claim one, Williams argues that his constitutional rights were violated when the trial judge denied his motion to suppress his "non-Miranda" statements which he contends were made while he was in police custody and without the benefit of a Miranda warning. (Doc. 1 at 15-16). Williams presented this same argument to the Alabama Court of Criminal Appeals on direct appeal, and, in its memorandum opinion affirming his conviction, the court found, as follows:

> Williams first argues that the trial court erred
> in denying his motion to suppress his statements
> to the police. Specifically, he contends that
> his statements were obtained during a custodial
> interrogation without his being advised of his
> Miranda rights.

In State v. Thomas, 843 So. 2d 834, 839 (Ala. Crim. App. 2002), this Court recently stated:

> The Miranda warnings are not required simply because the questioned person is a suspect or one on whom the investigation has focused. Oregon v. Mathiason, 429 U.S. 492 (1977). . . . "'While investigative focus is especially significant, it is custody and not focus which marks the point at which the Miranda warnings become mandatory.'" Perkins v. State, 574 So. 2d 988, 990 (Ala. Crim. App. 1990) (quoting Harris v. State, 376 So. 2d 773-74 (Ala. Crim. App. 1979)) (emphasis added.)

> "The test for custody is whether there was a restraint on freedom of movement of the degree associated with a formal arrest." See Campbell v. State, 718 So. 2d 123, 135 (Ala. Crim. App. 1997) ("In determining whether a suspect is in custody, a court must examine the totality of the circumstances of the situation using the perspective of a reasonable person in the suspect's position."); Stone v. City of Huntsville, 656 So. 2d 404, 408 (Ala. Crim. App. 1994) ("'[C]ustody arises only if the restraint on freedom [reaches] the degree associated with [a] formal arrest.'")

Here, Officer William Givens testified that Stallworth rode with him in an attempt to locate the man she had seen running away from the area at the time of the fire. According to Officer Givens, Stallworth observed Williams walking in front of his house and identified him as the man she had seen running down the railroad tracks. Officer Givens testified that he stopped and told Williams that he wanted to talk to him about some events that had happened and that Williams responded "Sure. No Problem." (R. 112.) Officer Givens stated that he asked Williams to get into a police car so that another officer could take

Williams to the police station to be interviewed and that Williams voluntarily agreed. Officer Givens further stated that Williams was not handcuffed or placed under arrest. According to Officer Givens, he went to the police station about 20 minutes after Williams, and interviewed him at that time. Officer Givens testified that he again asked Williams if he was still willing to speak with him and that Williams responded affirmatively. Officer Givens further testified that Williams was told several times during the questioning by police that he was not under arrest and that he was free to leave whenever he wanted. Additionally, the testimony indicated that Williams was never placed in handcuffs. The testimony further indicated that Williams consented to the police photographing him and that he agreed to leave his clothing with the police. Officers drove Williams home at the conclusion of the interview and photographing process. Officer Givens stated that Williams was not under arrest; that he was free to leave at whatever time he chose; and that he was never ordered to speak to police, submit to photographs, or relinquish his clothing. Finally, the evidence indicated that Williams was not actually charged with Ervin's death until May 21, 2003, eight days after being interviewed by the police.

Williams testified at the suppression hearing that he was ordered to go to the police station. He stated that he was never told that he could leave whenever he wanted. Rather, he stated that he was not even allowed to go to the bathroom while waiting at the police station.

The trial court obviously resolved credibility choices in favor of the State and concluded that Williams voluntarily went to the police station for the interview and that he understood that he was not required to do so and that he could terminate the interview at any time. The record supports such a finding.

Moreover, even if we were to conclude otherwise, Williams would not be entitled to any relief on the specific claim he asserts on appeal because

the substance of the statements he provided to the police contained no admissions of guilt. Further, to the extent that Williams admitted to being present in the house shortly before the victim was killed, the State presented other testimony placing Williams as the last person seen with the victim. Thus, even if the statements were improperly obtained, the statements were not so damaging to the defense as to amount to reversible error. Rather, error, if any, in the admission of the statements, was harmless. <u>See</u> Rule 45, Ala. R. App. P. Therefore, Williams is not entitled to any relief on this claim.

(Doc. 6, Att. 2 at 6-9) (footnotes omitted).

Having reviewed the record in this matter, the Court concludes that the state court's factual findings were reasonable, that Williams has not met his burden of rebutting the presumption of correctness of those factual findings by clear and convincing evidence, and that the legal analysis was neither contrary to, nor an unreasonable application of, <u>Miranda</u>. Therefore, Williams is not entitled to relief on the basis of habeas claim one, and that claim is due to be denied.

Williams' second habeas claim, that his constitutional rights were violated by the trial court's failure to suppress evidence obtained from an unlawful search, was also presented to the Alabama Court of Criminal Appeals on direct appeal. In its memorandum opinion affirming his conviction, the court found as follows:

Williams next argues that the trial court erred in denying his motion to suppress the

evidence seized from his residence. Specifically, he contends that the affidavit underlying the search warrant failed to set out sufficient or specific facts to support a finding of probable cause for issuing the warrant.

The affidavit supporting the issuance of the search warrant described the property to be searched for and seized as keys, red shirts and blue pants, shoes and other clothing; these items were to be examined for the presence of fire accelerants and/or blood, items that were used to cause blunt force trauma, and any property belonging to Ervin. The facts stated in support of the issuance of the warrant were as follows:

> "I am Sergeant Glenn J. Garside of the Mobile Police Department, currently assigned to the Homicide Detail. On 05-13-03, at approximately 1151 hours, members of the Mobile Police Department and Mobile Fire Rescue were called to the residence of 1424 Jesse Street for a residential fire. Once at the scene, the firefighters had to breech the front door, which was locked. Once the fire was extinguished, the fire personnel located the resident, Mamie Ervin, lying on the living room floor with thermal injuries as well as trauma to the head. Ervin was transported to the U.S.A.M.C. where she was pronounced deceased.

> "During the scene investigation a container commonly used to hold gasoline was found near the front of the residence, Detective William Givens also of the Homicide Detail interviewed Earline Stallworth. She said that while she was working in her yard, she observed a black male that she

knows, and could readily identify, running along the railroad tracks, which are located directly next to the victim's residence. She said that the male was running parallel to and apparently away from the victim's residence. Stallworth said that the male continued running south along the tracks and was carrying an unknown object as he did. She described the black male as wearing a red shirt and blue pants. She said that she immediately recognized him as her (Stallworth's) neighbor and a god child of the victim. Stallworth said that seconds later, she turned and looked back at the victim's residence and, through the front window, she could see a fire inside the residence.

"Stallworth agreed to ride with Detective Givens and identify the male's residence because although she knew him, she could not recall his name. As they drove to the residence, they turned on to McCants street, and Stallworth identified a male standing in front of the residence listed in Section One as the male she had observed. Stallworth even asked Detective Givens how the male had changed clothes so quickly. Detective Givens detained the male who identified himself as Glasco Williams III. Williams identified the residence listed in Section One as where he resided with his mother. Once Williams was detained, the residence was secured and officers were stationed at the residence to maintain security until a search warrant could be obtained. I then met with Stallworth and she

provided me with the same
information."

(Supp. R. 14-15.)

"Whether probable cause exists to justify
the issuance of a warrant is judged upon the
totality-of-the-circumstances analysis
reaffirmed in <u>Illinois v. Gates</u>, 462 U.S.
213, 103 S. Ct. 2317, 76 L. Ed. 2d 527
(1983)." <u>Hamm v. State</u>, 564 So. 2d 453, 459
(Ala. Crim. App. 1989). Probable cause to
search a residence exists when "there is a
fair probability that contraband or evidence
of a crime will be found in a particular
place." <u>Illinois v. Gates</u>, 462 U.S. at 238.
The traditional standard for review of a
finding of probable cause has been to
determine whether there is "a substantial
basis" for finding that a search would
uncover evidence of wrongdoing. <u>Id.</u> at 238-
39 (quoting <u>Jones v. United States</u>, 362 U.S.
257, 271 (1960)). The magistrate is "to
make a practical, common-sense decision …,
given all the circumstances set forth in the
affidavit before him, including the
'veracity' and 'basis of knowledge' of
persons supplying hearsay information …."
<u>Id.</u> at 238.

Here, the affidavit clearly indicated that
Erwin's body was found in her burning house
and that she had suffered both fire-related
and trauma-related injuries, and that an
eyewitness had seen Williams running away
from the area carrying an unknown object
immediately before the fire was discovered.
The affidavit further indicated that the
eyewitness rode with an officer to the area
where she believed the individual would be
found and, when they encountered him, she
identified him as the man who she saw
running away from the area. She also noted
that he had already changed his clothing.
The facts presented in the affidavit were
sufficient to establish the "fair
probability that contraband or evidence of a
crime [would] be found in a particular

place." <u>Illinois v. Gates</u>, 462 U.S. at 238. Therefore, we find no error in the trial court's denial of Williams's motion to suppress.

Moreover, even if the affidavit was insufficient to establish probable cause, the evidence seized in this case was properly admitted under the good faith exception to the exclusionary rule.

> "'The good faith exception provides that when officers acting in good faith, that is, in objectively reasonable reliance on a warrant issued by a neutral, detached magistrate, conduct a search and the warrant is found to be invalid, the evidence need not be excluded.' <u>Rivers v. State</u>, 695 So. 2d 260, 262 (Ala. Crim. App. 1997).

> > "'In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. "[O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law." [<u>Stone v. Powell</u>], 428 U.S. [465,] at 498 [(1976)] (Burger, C.J., concurring).'

> "<u>United States v. Leon</u>, 468 U.S. 897, 921 (1984).

> "In <u>Leon</u>, the United States Supreme Court recognized four circumstances in which the good-faith exception was inapplicable:

> (1) when the magistrate or judge
> relies on information in an
> affidavit that the affiant knew
> was false or would have known was
> false except for his reckless
> disregard of the truth; (2) when
> the magistrate wholly abandons his
> judicial role and fails to act in
> a neutral and detached manner; (3)
> when the warrant is based on an
> affidavit so lacking an indicia of
> probable cause as to render
> official belief in its existence
> entirely unreasonable; and (4)
> when the warrant is so facially
> deficient that the executing
> officer cannot reasonably presume
> it to be valid."

Straughn v. State, 876 So. 2d 492, 499-500 (Ala. Crim. App. 2003).

Here, none of the circumstances discussed in Leon were present to negate the good-faith exception. Based on the record, we cannot say that the affidavit in support of the warrant contained false information. Further, there is nothing indicating that the judge failed to act in a neutral and detached manner. Finally, we cannot say that the warrant was so facially deficient or lacking an indicia of probable cause as to make it unreasonable for the investigating officers to believe that it was valid.

Because the good-faith exception applies in this case, even if the affidavit supporting the search warrant was deficient, the evidence was properly admitted and the trial court's denial of Williams's motion to suppress was not error. For these reasons, Williams is not entitled to any relief on this claim.

(Doc. 6, Att. 2 at 9-14).

Having reviewed the record in this matter, the Court concludes that the state court's factual findings were reasonable, that Williams has not met his burden of rebutting the presumption of correctness of those factual findings by clear and convincing evidence, and that the legal analysis was neither contrary to, nor an unreasonable application of, <u>Illinois v. Gates</u> or <u>United States v. Leon</u>. Therefore, Williams is not entitled to relief on the basis of habeas claim two, and that claim is due to be denied.

II. <u>Amended Petition Claim 3</u>.

In claim three, Williams asserts, for the very first time on constitutional grounds, that he was "denied Due Process and a Fundamental Fair Trial because he was convicted based on insufficient evidence." (Doc. 8 at 2). However, a review of the record indicates that Williams has failed to exhaust this claim by not having clearly presented this claim to the state court, either on direct appeal or in his Rule 32 petition.[4] The

---

[4] The exhaustion doctrine requires that a petitioner "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999). In Alabama, the established appellate review process includes an appeal to the Alabama Court of Criminal Appeals, an application for rehearing to the Alabama Court of Criminal Appeals, and an application for discretionary review by the Alabama Supreme Court. <u>See</u> <u>Ala R. App. P.</u> 4, 39, 40. A review of the record of Williams' state court proceedings shows that he did not, with regard to the denial of his Rule 32 (Continued)

Court notes that while Williams did challenge the sufficiency of the evidence, specifically the circumstantial evidence used to convict him, in his direct appeal, he did not do so on constitutional grounds.[5]  See McNair v. Campbell, 416 F.3d 1291, 1302 (11th Cir. 2005) ("[I]n order to ensure that state courts have the first opportunity to hear all claims, federal courts 'have required a state prisoner to present the state courts with the same claim he urges upon the federal courts.'").  Therefore, this claim appears to be procedurally barred from this federal habeas action.

However, under 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  See also Thompson v. Secretary for Dep't of Corr., 517 F.3d 1279, 1283 (11th Cir. 2008) ("We may, however, deny Petitioner's petition for habeas relief on the merits regardless of his failure to

_____

petition, file an application for discretionary review by the Alabama Supreme Court.  (Doc. 7, Atts. 1-14).  Therefore, his due process claims were not fully exhausted and are now procedurally defaulted.

[5] The Alabama Court of Criminal Appeals denied Williams' insufficient evidence claim, and found that "there was ample evidence from which the jury could have reasonably concluded that the evidence excluded every reasonable hypothesis except that of Williams's guilt."  (Doc. 6, Att. 2 at 18).

exhaust the claim in state court.") (citing 28 U.S.C. § 2254(b)(2)). Having considered this claim *de novo*, the Court finds it to be without merit.

On habeas review of the sufficiency of the evidence to support a criminal conviction, the critical inquiry is "whether the evidence could reasonably support a finding of guilt beyond a reasonable doubt." Wilson v. Hooks, 2009 WL 3003964, *10 (M.D. Ala. Aug. 17, 2009).

> [T]his inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Woodby v. INS, 385 U.S., at 282, 87 S. Ct. at 486 (emphasis added). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Jackson v. Virginia, 443 U.S. 307, 318-319 (1979).

Having thoroughly reviewed the record in this matter, the Court is satisfied that a rational trier of fact could have found the essential elements of the crime of capital murder beyond a reasonable doubt. Evidence presented at trial indicated that Williams was identified by the victim's neighbor, Earline Stallworth, who testified that she saw Williams jogging away from the direction of the victim's home just prior to the fire. (Doc. 11, Att. 7 at 105-106). Williams' clothing, which was recovered by police, contained DNA which matched that of the

victim.  (Id., Att. 9 at 115, 119, 124).  Additionally, testimony was presented that Williams was the last person seen with the victim prior to her death.  (Id., Att. 8 at 144). Thus, even if Williams had properly raised this claim in the state courts, he has not established that he is entitled federal habeas relief.  Therefore, Williams' habeas claim three is due to be denied.

   III.  <u>Amended Petition Claims 4-15</u>.

   Williams next argues that he is entitled to relief under § 2254 on twelve separate grounds of ineffective assistance of counsel, in violation of his rights under the Sixth Amendment. (Doc. 8 at 3-48).  Respondent contends that Williams has procedurally defaulted each of these claims because while he initially presented these claims in his Rule 32 petition, upon denial, he failed to seek discretionary review in the Alabama Supreme Court via a petition for writ of certiorari.  While it does appear that Williams failed to fully exhaust these claims in the state courts, the Court may, as noted above, under 28 U.S.C. § 2254(b)(2), "deny Petitioner's petition for habeas relief on the merits regardless of his failure to exhaust the claim in state court." <u>Thompson v. Secretary for Dep't of Corr.</u>, 517 F.3d 1279, 1283 (11th Cir. 2008) (citing 28 U.S.C. § 2254(b)(2)).  Having considered each of these claims *de novo*, the Court finds each of them to be without merit.

To prevail on any of his claims of ineffective assistance of counsel, Williams bears the burden of establishing by a preponderance of the evidence that his trial and/or appellate counsel's performance was deficient and that he was actually prejudiced by the inadequate performance. Strickland v. Washington, 466 U.S. 668 (1984). The elements to be considered are as follows:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id., 466 U.S. at 687. Thus, Williams must demonstrate that his counsel's performance "fell below an objective standard of reasonableness," Strickland, 466 U.S. at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "Establishing these two elements is not easy: 'the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between.'" Van Poyck v. Florida Dep't of Corr., 290 F.3d 1318,

1322 (11th Cir. 2002) (quoting <u>Waters v. Thomas</u>, 46 F.3d 1506, 1511 (11th Cir. 1995)).

An ineffective assistance of counsel claim is examined under the "totality of the circumstances." <u>House v. Balkcom</u>, 725 F.2d 608, 615 (11th Cir. 1984). An attorney's performance is presumed to have been reasonable and must not be examined with the aid of judicial hindsight. <u>Messer v. Kemp</u>, 760 F.2d 1080, 1088 (11th Cir. 1985). A federal court must apply a "heavy measure of deference to counsel's judgments." <u>Singleton v. Thigpen</u>, 847 F.2d 668, 670 (11th Cir. 1988) (quoting <u>Strickland</u>, 446 U.S. at 691).

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial…. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

<u>Grayson v. Thompson</u>, 257 F.3d 1194, 1216 (11th Cir. 2001) (quoting <u>White v. Singletary</u>, 972 F.2d 1218, 1220-21 (11th Cir. 1992)).

Moreover, particularly as to Williams' trial attorneys in this case, the Court recognizes that "[w]hen courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger."

<u>Chandler v. U.S.</u>, 218 F.3d 1305, 1316 (11th Cir. 2000). The record details the experience of Williams' – notably - three trial attorneys as follows:

> THE COURT: . . . I might point out for the record that Mr. Yelverton has been a criminal defense lawyer in this state for twenty years. Mr. Yelverton, it's my understanding, has defended – at least tried to a jury at least fifteen to twenty death penalty cases.
>
> Having thirty-five years of experience, Mr. Williams, and being fairly close to the criminal justice system as I have been throughout my career, I can say that Mr. Yelverton may have tried as many capital cases as just about any criminal defense lawyer in this state. If he isn't, he ranks right up there at the top.
>
> In addition to that, you have got Ms. Smith, who has been practicing law for eighteen years. She has defended at least two criminal capital murder cases to a jury, and has handled and settled maybe as many as five others. An extremely capable and intelligent, effective lawyer.
>
> And the court felt, because it wanted to do everything within my power to make sure that you were given more than what most people charged with offenses like yourself, even more resources, the court felt it incumbent to appoint Ms. Debbie McGowin. Now, Ms. McGowin has practiced law for thirteen years in this community, and it has all been criminal law. She has tried five capital murder cases and settled numerous others.
>
> That's fifty-one years of legal experience that's sitting there at the table with you, all primarily criminal law. Most of which have been handling some of the most serious offenses that we have on our books.

. . . .

> And I want to also make it clear that of all
> the cases – criminal capital murder cases
> that I have appeared in, both from the
> prosecution standpoint and from the defense
> standpoint, that I don't think I have ever
> seen a case prepared any more diligently by
> three lawyers than the lawyers that are
> sitting with you. And that includes my
> having tried cases against the Southern
> Poverty Law Center and some of the best
> lawyers in this state.
>
> I will also tell you that they have renewed
> and asked for various motions and matters
> and this court has not one time refused to
> grant everything that they have asked for
> just about, other than the motions to
> suppress. I can't think of anything they
> have asked for on your behalf that this
> court hasn't granted.
>
> You clearly have been represented. You
> know, most of the time – the law says that a
> person charged with a capital offense at
> least has to be given appointed counsel who
> has five years' experience. You have got
> over fifty sitting there with you. The law
> also says that you don't necessarily have to
> have two or three other lawyers with you.
> You've got three lawyers representing you,
> when the law says all you have to have is
> somebody who has five years' experience. So
> unquestionably you have – you have been
> represented to this point in a way that,
> frankly, I don't think I have ever seen any
> other capital defendant given a defense.

(Doc. 11, Att. 4 at 56-63). Acknowledging that the very best
lawyer could have a bad day and that an inexperienced lawyer can
be competent, the <u>Chandler</u> court noted that the point is a small
one: "Experience is due some respect." <u>Chandler</u>, 218 F.3d at
1316 n. 18.

The Court now considers each of Williams' ineffective assistance of counsel claims in turn.

A. <u>Failure to Provide a DNA Expert (Claim Four)</u>

In Williams' claim four, he alleges that his trial attorneys were ineffective because he failed to have a DNA expert to testify during his murder trial. (Doc. 8 at 3-10). This claim was presented by Williams in his Rule 32 petition and was denied by the trial court and the Court of Criminal Appeals. The trial court found, as follows:

> Petitioner alleges he was denied effective assistance of trial counsel because they failed to provide a DNA expert at trial to assist in his defense. In support of this allegation, Petitioner states that a DNA expert could have provided the answer to the main question of whether the blood of the victim was on his clothing, could have presented testimony as to whether the quantity of blood was sufficient enough to conduct a quality test and produce reliable results, and listen to the testimony of the State's expert and present his own testimony as to the reliability of the State's methods, could have provided different population frequency statistics than presented by the State, and reviewed the work of ADFS and testified as to any negative findings. This allegation is without merit.
>
> Petitioner's counsels in fact employed the use of Immunogenetics/DNA Diagnostic Lab of the University of Alabama Health Services Foundation. See Affidavits. The Lab determined that all methods used by the Alabama Department of Forensics in testing the swabs were accurate and reliable, thus there should be no error in the results.

> See Affidavits.  Based on these findings, a
> decision was made not to use the DNA expert
> because there was no indication that the
> expert would have aided the defense in this
> area.  Said results could be used to bolster
> the State's expert testimony and this would
> have been more damaging to Petitioner's
> case.  This was purely a strategic decision.

(Doc. 6, Att. 11 at 67).

A review of the court record reflects a Motion for Funds to Obtain a DNA Expert was filed by defense counsel and granted many months before the start of his trial.  (Doc. 11, Att. 1 at 83-86).  The record further reflects that Williams' trial attorneys considered the DNA expert, and consistent with the trial court's finding, using their "judgment," made the decision against using the DNA expert at trial.  In her affidavit, trial attorney Selma L. D. Smith avers that the lab that they employed on Williams' behalf "found no deficiencies in the process or procedures used by the State's lab to test the DNA evidence." Doc. 11, Att. 14 at 36.  Based upon information provided by the lab, Williams' trial attorneys decided not to have the DNA tested.  (Id.).  Thus, as to this claim, Williams has failed to establish by a preponderance of the evidence deficient performance on the part of his trial attorneys. Strickland v. Washington, 466 U.S. 668 (1984).  Therefore, claim four is due to be denied.

B.  Denied Right to Conduct Own Defense (Claim Five)

Williams next claims that he was denied effective assistance of counsel because he was denied the right to conduct his own defense.  Williams raised this claim in his Rule 32 petition, and the trial court denied it as follows::

> This argument is without merit.  A request to represent one's self must be made "clearly and unequivocally."  _Faretta v. California_, 422 U.S. 806, 835, 95 S. Ct. 2525, 2541 (1975).  The record provided by the Petitioner clearly shows that Petitioner wanted his counsel to pursue his theory of defense or no longer continue to represent him.  However, the record does not reflect that at any time did he clearly and unequivocally advise anyone that he wanted to represent himself.  Petitioner goes on to assert what he wished to have done.  Thus, this claim fails because Petitioner has failed to present any material issue of law or fact which would entitle him to relief.  R. 32.7(d).  It was Petitioner's trial counsels' understanding that he did not wish them to pursue their theory of defense, but his, and if they would not, that he no longer wanted them to represent him.  See Affidavits.  However, Petitioner never indicated a desire to be his own counsel.  See _id._

(Doc. 6, Att. 11 at 67-68).

In _Faretta v. California_, 422 U.S. 806 (1975), the Supreme Court observed that while the Constitution guarantees each person brought to trial in any state or federal court the right to the assistance of counsel, the Constitution does not at the same time force counsel on the accused.  "When an accused manages

his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits." Id. at 835 (quoting Johnson v. Zerbst, 304 U.S. 458, 464-465 (1938)). The Court further noted that the accused must "clearly and unequivocally" declare that he does not want assistance of counsel, and that he wants to represent himself. Faretta, 422 U.S. at 835.

In Gill v. Mecusker, 633 F. 3d 1272 (11th Cir. 2011), the Eleventh Circuit recently observed:

> Although Faretta was not primarily concerned with clarity and equivocation in making a request to proceed *pro se*, it is clear from the Court's decision that a trial court's obligation to conduct a "*Faretta* hearing," at which a defendant is "made aware of the dangers and disadvantages of self-representation[,]"is triggered by the defendant's "clear and unequivocal assertion of a desire to represent himself." *See, e.g.,* Raulerson v.Wainwright, 469 U.S. 966, 969-70, 105 S. Ct. 366, 369-70, 105 S. Ct. 366, 369, 83 L. Ed. 2d 302 (1984)(Marshall, J. dissenting from denial of certiorari) ("Accordingly, in Faretta we indicated that a defendant's clear and unequivocal assertion of a desire to represent himself must be followed by a hearing, in which he is 'made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.'" (quoting Faretta, 422 U.S. at 835) (footnote omitted)); Stano v.

33

Dugger, 921 F.2d 1125, 1144(11th Cir. 1991)("Once the right of self-representation has been asserted clearly and unequivocally, understandable to the trial court by the reasonable person standard, then and only then is that court, under Supreme Court and Eleventh Circuit case law, required to conduct the requisite inquiry to determine whether the criminal defendant's decision to represent himself is knowing, intelligent and voluntary.");Cross v. United States, 893 F. 2d 1287, 1290 (11th Cir. 1990)("In recognition of the thin line that a district court must traverse in evaluating demands to proceed pro se, and the knowledge that shrewd litigants can exploit this difficult constitutional area by making ambiguous self-representation claims to inject error into the record, this Court has required an individual to clearly and unequivocally assert the desire to represent himself."); Dorman v. Wainwright, 798 F. 2d 1358, 1366(11th Cir. 1986)("Insofar as the desire to proceed pro se is concerned, petitioner must do no more than *state his request*, either orally or in writing, *unambiguously* to the court *so that no reasonable person can say that the request [to proceed pro se] was not made*." (emphasis added)).

Id. at 1293. A searching review of the record in this case fails to reveal any request by Williams that could be reasonably construed as a request to represent himself without assistance of counsel. A lengthy *ex parte* discussion occurred between the trial judge and Williams' attorneys prior to the start of the trial regarding his last minute objections to their trial strategy. At one point, Rick Yelverton, one of Williams' attorneys, stated "[s]o we're one hundred percent clear, Judge,

he is not suggesting he wanted to represent himself." (Doc. 11, Att. 4 at 27). A hearing was held, immediately prior to the trial, which included Williams, his attorneys and the trial judge. During the hearing, the following discussion occurred:

> THE COURT: Around somewhere between 11:00 and a quarter until 12:00, I think, I was approached by your attorneys, Mr. Williams. And there are three attorneys in this case who have been appointed to represent you. I was approached and asked if they could discuss a matter with me that they felt they were --- they had some concern or a great deal of concern, frankly, with their position with regards to representing you in this matter.

> And, frankly, nothing specifically was discussed at all except for them to explain to me generally that there was a significant conflict that had developed just this morning and had never been discussed prior to this morning at least with Mr. Yelverton or Ms. McGowin, and actually it hadn't really been discussed in any particular length with Ms. Smith months and months ago (sic). But it was brought to their attention that you objected to the trial strategy that they may have in your case and how they would represent you and focus their defense for you in this case. And stated to me that you had – that you had, in fact, told them that you would forbid them to in any way use the defense and theory of defense that they had been working on diligently for months and months now, and that you preferred that you – that they represent you using a theory of defense in which you – that you say that you would prefer them to use.

> . . . .

> Now, this morning, right before the jury is to be qualified to come in here to try you,

you have chosen, for whatever reason, to
direct your counsel to choose a defense or a
line of defense or focus on a different
trial strategy in which they have a serious
problem. And that problem apparently is
that they, with their over fifty years of
experience, feel like it may not be in your
best interest.

And I will tell you that you are not a
lawyer. And a capital murder case is
extremely complex. And it needs a
sophisticated, effective, intelligent,
experienced person to be able to handle it
in a court of law. And, frankly, you are
not capable of doing that for yourself. I
want to advise you of that.

. . . .

MR. YELVERTON: . . . As the court has stated
for the record, in the interim between us
arriving this morning and where we are now,
which is, I guess, a quarter after 2:00 on
the day of jury selection, and meeting with
Mr. Williams and having Mr. Williams express
to us what his preference was – it wasn't
his preference, it was his direction to us
as his lawyers, we had asked for the
opportunity speak (sic) to the
representatives of the State Bar to ask them
what we should do.

And it's my motion, after speaking to Mr.
Moss from the Alabama State Bar, to seek to
withdraw as a representative of Mr.
Williams. I am advised that it's my duty to
– no excuse me, that I may seek to withdraw
pursuant to Rule 1.16(b)(3) and, there
again, after factually describing, you know,
where I was with Mr. Moss, he felt like, you
know, I probably had no alternative. But
the key word is "may", and, of course,
that's up to the court's discretion as to
whether or not I would be allowed to
withdraw. But that is my motion before the
court.

THE COURT: All right.

MS. MCGOWIN: And, Judge, I join in Mr. Yelverton's motion for the same reasons.

THE COURT: All right, Ms. McGowin. Ms. Smith.

MS. SMITH: Yes, sir, Judge. What I understand Mr. Yelverton's conversation with the representative of the Bar Association, I do too.

THE COURT: Okay. Mr. Williams, do you understand what your lawyers have told this court?

THE DEFENDANT: Yes, sir. Fully understand.

THE COURT: Now, have you got anything you want to say before I rule on any motions?

THE DEFENDANT: I wish not to speak at all.

THE COURT: You don't want to speak at all?

THE DEFENDANT: No, sir. What's been said for the record in court is what has been said.

. . . .

THE COURT: I will tell you that you have a constitutional right to have your case tried in a way that best represents you. And that's what these lawyers' duty will be. And they will make a decision as to how to best represent your interest in this case. But I'm denying your motion to continue. I am denying each of your motions to withdraw.

(Doc. 11, Att. 4 at 52-53, 57-61, 63-64).

This record reflects that Williams was provided an opportunity in which to express his desire to represent himself; however, he made no such request-unequivocal or otherwise. In

37

fact, there is absolutely nothing in the record that could be construed as placing either the Court or defense counsel on notice of William's alleged desire to represent himself. Instead, the record reflects that Williams chose to remain silent when provided an opportunity to address the Court regarding this issue. Having chosen to remain silent, Williams cannot now complain that he should have been allowed to represent himself[6].

C.  Failure to Object to Wrongfully Seized Evidence (Claim Six)

In his claim six, Williams argues that his trial attorneys were ineffective because they failed to object and have the trial court rule on whether evidence seized from Williams violated his Fourth Amendment rights. (Doc. 8 at 15-20). Williams presented this claim in his Rule 32 petition, and the trial court denied it as follows:

> Petitioner also alleges he received ineffective assistance of counsel because his counsel failed to object to and have the Court rule on whether the items seized from him violated the Fourth Amendment. This argument is also without merit. The case action summary sheet clearly shows that there were several motions in limine and

---

[6] It is noteworthy that this was not the first instance in which Williams clashed with his defense counsel. The record reflects that earlier in the case, Williams' initial trial attorney, Greg Hughes, was permitted to withdraw from the case. (Doc. 6-11, ps. 5-6)

motions to suppress filed in this matter. One of those motions was a motion to suppress any and all items seized from the person of Petitioner on the day he was picked up. An extensive hearing was conducted on this motion on October 14, 2004. The Judge denied this motion.

Petitioner also alleges trial counsel failed to move to suppress his statement because he was in fact in custody and the clothing seized from him at that time. Petitioner's arguments are again without merit. The record in fact shows that Counsel filed a motion to have his statement suppressed and the clothing suppressed. The record also shows that a hearing was conducted and the Court denied the motions. As to his statement, the Court denied the motion up to the point where Petitioner mentions an attorney. See Case Action Summary Sheet. Petitioner has failed to raise a material issue of law for which he is entitled to relief. R. 32.7(d).

(Doc. 6, Att. 11 at 68-69). Following an extensive review of the record in this matter, the undersigned finds, just as the state courts did, that Williams' trial attorneys did in fact file two motions to suppress evidence seized from him, and that the motions were argued extensively before the trial court. (Doc. 11, Att. 1 at 51-52, 66-67, 74-75, 79-82, Att. 2 at 118-217, Att. 3 at 2-102). Therefore, Williams' contention that his trial counsel failed to seek the suppression of this evidence is not supported by the record, and is due to be denied.

D. __Failure to Present Evidence that Venire Not Representational of Community (Claim Seven)__

Williams' next claim of ineffective assistance of counsel stems from his belief that his trial attorneys failed to present evidence in support of an argument that the venire did not fairly represent a cross section of the community. (Doc. 8 at 20-22). Williams raised this issue in his Rule 32 petition to the state courts. In denying the claim, the trial court held as follows:

> Petitioner next alleges he received ineffective assistance of counsel because counsel failed to present evidence in support of their challenge to the venire not representing a fair cross section of the community. This allegation should fail. Petitioner's counsel in fact asked the Court to take judicial notice of the composition of the County as well as provided the Court with a percentage. Additionally, Petitioner does not show how he was prejudiced by this. He generally alleges that he suffered prejudice and his rights were violated but does not tell this Court how or why he suffered any such prejudice. Thus, Petitioner's claim fails for lack of specificity, R. 32.6(b) and he does not meet the standards as set out in Strickland.

(Doc. 6, Att. 11 at 69).

Having considered this claim *de novo*, the undersigned finds that Williams has failed to show ineffective assistance of counsel with respect to the make-up of the venire. The record reflects that Williams' trial attorneys did in fact object to the venire, and requested that the trial court take judicial

notice from a then recent county wide election that the jury
panel was not diverse in accordance with Mobile County's racial
composition. (Doc. 11, Att. 6 at 129). Furthermore, pursuant
to Strickland, Williams must not only show that his attorneys
were ineffective, but also that their performance caused him to
suffer prejudice. Strickland, 466 U.S. 668. This he has not
done. Thus, Williams' claim seven should be denied.

E. Failure to Request Jury Instruction as to Break in
Chain of Custody (Claim Eight)

Williams next claims that his trial counsel was ineffective
for failing to ask the court to give a jury instruction
regarding a break in the chain of custody of the DNA evidence.
(Doc. 8 at 22-27). When Williams presented this claim in his
Rule 32 petition to the state courts, the trial court ruled as
follows:

> Petitioner alleges he received ineffective
> assistance of counsel because trial counsel
> failed to request the Court give a jury
> instruction regarding a break in the chain
> of custody. This allegation is without
> merit. Petitioner claims that Detectives
> unsealed the clothing, spotted the spots and
> then took the clothing to be analyzed and
> this was the break in the chain of custody.
> Petitioner also alleges there was no
> testimony regarding this during the trial.
> However, Petitioner quotes from Detective
> Donald Gomien's testimony during trial as
> being that he reviewed the evidence and he
> took it to Forensics Sciences for testing.
> Thus, Petitioner has raised no material

> issue of fact or law which would entitle him
> to relief.

(Doc. 6, Att. 11 at 69).

Upon review of Williams' claim *de novo*, the undersigned finds that it is without merit. In his Amended Petition, Williams states that "Officer Gordon testified that he was the first Officer to obtain custody of the Khaki shorts and Black Tennis Shoes on May 13, 2003, and that he turned the clothing over to Corporal Womack on that night." (Doc. 8 at 24). Williams then states that "Corporal Womack testified that he did in fact receive the clothing from Officer Gordon on May 13, 2003 and that he then turned the clothing over to Bill Jones of the ADFS for testing on May 19, 2003." (Id. at 25). According to Williams, there was a break in the chain of custody as three of the officers who handled his clothing are not accounted for and did not testify. In support of his contention, Williams quotes the following testimony from Detective Donald Gomien:

> But one of the things that weighed real
> heavy in the decision to make the arrest was
> that a day or two later the clothes were
> brought back out of our evidence and placed
> in the Homicide Unit on a White paper. We
> gloved. I took the magnifying glass and
> began to go over the – his clothing that was
> taken from him. And at that point is when I
> spotted some spots that appeared to be blood
> to me. And some – what appeared to be black
> smut on the shorts, and then also what
> appeared to be blood on the shoes that the
> Defendant was wearing at that time. That
> was packaged. And right then – from there

42

> we went straight to the Department of
> Forensic Sciences where I requested the
> scientist there, Bill Jones, to – William
> Jones, to test to see if it was human blood.

(Id. at 25). "The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence." Revis v. State, 2011 WL 109641, *28 (Ala. Crim. App. 2011) (internal quotation marks omitted). "Moreover, the evidence need not negate the remotest possibility of substitution, alteration, or tampering, but instead must prove to a reasonable probability that the item is the same as it was at the beginning of the chain." Id. The record, from which Williams quotes extensively, does not suggest or indicate that any tampering with evidence occurred. Moreover, assuming arguendo that there was a break or a missing link in the chain of custody, Williams has put forth no evidence which suggests that had there been an objection from his defense attorneys, "the result of [his] proceeding would have been different." Strickland, 466 U.S. at 694. Therefore, his claim eight is due to be denied.

F.   Denial of his Right to Testify (Claim Nine)

In his ninth habeas claim, Williams argues that he was denied effective assistance of counsel because his trial attorneys denied him his constitutional right to testify. (Doc.

43

8 at 27-31).  Williams presented this argument in his Rule 32 petition, and the trial court denied it as follows:

> Petitioner also alleges he was denied effective assistance of trial counsel because he was denied the right to testify. This allegation is directly refuted by trial counsel.  <u>See</u> Affidavits.

(Doc. 6, Att. 11 at 70).  In their sworn affidavits submitted to the trial court prior to Williams' Rule 32 hearing, each of Williams' trial attorneys stated under oath that he did not advise them of a desire to testify in his trial. (Doc. 6, Att. 11 at 38, 42, 45).  Aside from his assertions, Williams offers no evidence to the contrary.  The Court cannot assume that Williams' attorneys did not consult with him and that he did in fact advise them of his desire to testify.  <u>Harvey v. Warden, Union Correctional Institution</u>, 2011 WL 37824, *12 (11th Cir. 2011) (citing <u>Williams v. Head</u>, 185 F.3d 1223, 1228 (11th Cir. 1999) ("[W]here the record is incomplete or unclear about [trial counsel's] actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.").  Williams has failed to meet his burden; thus, claim nine is due to be denied.

   G.   <u>Failure to Object to In-court Identification of Petitioner (Claim Ten)</u>

Next, Williams claims that he was denied effective assistance of counsel as a result of his trial attorneys'

failure to object to the in-court identification of him by state witness Earline Stallworth because it stemmed from a suggestive out-of-court show up identification. (Doc. 8 at 31-34). When Williams presented this claim to the state courts, the following determination was made:

> Petitioner alleges he was denied effective assistance of trial counsel where Counsel failed to object to the in court identification of Petitioner by the State's witness Earline Stallworth on the grounds that it stemmed from a suggestive out of court show up identification. This allegation is also without merit. In support of this allegation Petitioner quotes from witness Stallworth's testimony and states that she saw the individual, recognized him as Vera Mae's boy, she then rode around with detectives, and she identified him as the person she saw jogging.
>
> The witness then identified Petitioner as the person she saw running down the tracks. There was never any indication that the officer asked the witness if that was the person she saw until after she had indicated he in fact was the person she saw. Petitioner correctly points out the factors to be used in determining if the pretrial show up resulted in the likelihood of misidentification. In light of the above, Petitioner has failed to show the likelihood that he was misidentified considering the fact that it was the witness who pointed him out to police after she was shown another subject.

(Doc. 6, Att. 11 at 70).

In his Amended Petition, Williams acknowledges that after giving police a description of him, witness Stallworth rode

around with a detective, and that "after the Detective informed her that they had a suspect, after looking at the individual, she stated it was not him." (Doc. 8 at 33). After leaving that "incident," the "Detective drove the witness to the Petitioner's residence, and as Petitioner was leaving home, she identified the Petitioner as the individual she saw jogging." (Id.).

After a thorough review of the record, the undersigned finds that Williams has failed to show any likelihood that he was misidentified. Ms. Stallworth's identification of Williams was clearly not based on the Detective's suggestion, but on her own independent knowledge. Thus, there was no reason for Williams' attorneys to make an objection, and they cannot be deemed ineffective for failing to make an objection for which there was no legal basis. See Reigosa v. U.S., 2011 WL 346076, *9 (S.D. Fla. 2011) ("Trial counsel, therefore, did not render constitutionally ineffective assistance when he failed to raise the now-presented non-meritorious challenges to the career offender sentence or prior state court conviction."). See also Knowles v. Mirzayance, __ U.S. __, 129 S. Ct. 1411, 1420-22 (2009) (stating that Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success). Therefore, Williams' claim ten is due to be denied.

### H.  Failure of Appellate Counsel to Raise on Appeal Trial Court's Erroneous Jury Instruction (Claim Eleven)

Williams next claims that he was denied effective assistance of appellate counsel due to his counsel's failure to raise on direct appeal the trial court's erroneous jury instruction. (Doc. 8 at 34-37). Williams presented this issue in his Rule 32 petition, and it was denied by the state trial and appellate court as follows:

> Petitioner next alleges he was denied effective assistance of appellate counsel because he failed to raise the trial Court's giving of an erroneous jury instruction. Specifically, Petitioner alleges the State's requested jury charge regarding his suppression of evidence or attempt to suppress evidence may be used to imply guilt. Robinson v. State, 43 Ala. App. 111, 183 So. 2d 282, states: "Any act proving or tending to prove an effort or desire on the part of the defendant to obliterate evidence of a crime is relevant, for from such fact, if unexplained, the jury may justly infer consciousness of guilt." Thus, Counsel cannot be ineffective for failing to raise a claim for which there is no legal basis. See U.S. Const. amend. VI; see also Patrick v. State, 680 So. 2d 959, 963 (Ala. Cr. App. 1996); Hope v. State, 521 So. 2d 1383, 1386 (Ala. Cr. App. 1988).

(Doc. 6, Att. 11 at 70-71).

Williams has offered nothing to suggest that the trial court's jury instruction was erroneous. Thus, his counsel cannot be deemed ineffective for failing to raise a claim for which there was no legal basis. Furthermore, Williams cannot

show that he was prejudiced as a result of the jury instruction. *Strickland*, 466 U.S. 668. Having reviewed this claim *de novo*, the undersigned finds, for the precise reason as stated by the state courts, that Williams' claim eleven is due to be denied as he has failed to show any ineffectiveness on the part of his appellate counsel with regard to this issue.

   I.   Failure of Appellate Counsel to raise Petitioner's Objection to State's violation of Batson (Claim Twelve)

In claim twelve, Williams alleges that he was denied effective assistance of appellate counsel because his appellate counsel failed to raise on direct appeal his objection to the state's use of its preemptory strikes in a discriminatory manner to remove members of his race from serving as "petit jurors" in violation of Batson v. Kentucky. (Doc. 8 at 37-41). Williams presented this argument in his Rule 32 petition. The trial court's findings, which were adopted by the Alabama Court of Criminal Appeals, were as follows:

> Petitioner next alleges he was denied effective assistance of appellate counsel because he failed to raise on direct appeal a Batson challenge. This allegation is also without merit. A trial court's finding that there has been no violation of Batson is entitled to great deference on appeal. See Knight v. State, 652 So. 2d 771, 773 (Ala. Cr. App. 1994). In this case, Petitioner states that after a hearing, the Court found that all but one strike was race neutral.

48

> Based on the information provided by the
> Petitioner, the explanations provided are
> race neutral. Petitioner has provided no
> factual basis to substantiate his allegation
> that the strikes were something other than
> race neutral. Thus, counsel cannot be
> ineffective for failing to raise a claim for
> which there is no legal basis. See U.S.
> Const. amend. VI; see also Patrick v. State,
> 680 So. 2d 959, 963 (Ala. Cr. App. 1996);
> Hope v. State, 521 So. 2d 1383, 1386 (Ala.
> Cr. App. 1988).

(Doc. 6, Att. 11 at 71).

Following a complete review of the record, the undersigned finds that Williams has failed to establish that there was any legal basis for a Batson claim on appeal. The record reflects that the trial court found that the Government provided a race neutral reason for striking several potential jurors, except one, as they each had criminal records, or at least arrests. The trial court rejected the Government's proffered reason for striking Juror No. 26, namely that she has some respect for psychologists. Juror No. 26, a black female, was returned to the panel, and the Government then used its one remaining strike on Juror No. 56, an American Indian. The Government defended its strike of Juror No. 56 on the ground that in response to a question about whether you have ever visited a prison, jail or detention center, Juror No. 56 responded that she had visited her brother and drew a "smiley face". The Government argued that her "smiley face" drawing in a capital murder case was

inappropriate. (Doc. 11-6, ps. 120-127). The trial court ruled that the Government had proffered a race neutral reason. (Id.) As found by the state courts, Williams has provided no factual basis to substantiate his allegation that the strikes were something other than race neutral and there is nothing in the record that suggests that an examination of the juror questionnaires would yield anything different. In light of the record evidence, Williams' appellate counsel cannot be deemed ineffective for failing to appeal an issue for which there was no legal basis. Therefore, his claim twelve is due to be denied.

J.   <u>Failure of Appellate Counsel to raise Petitioner's Request for Mistrial because of State's Violation of Brady v. Maryland (Claim Thirteen)</u>

Williams next claims that he was denied effective assistance of appellate counsel because his appellate counsel failed to raise for review his request for a mistrial based on the state's alleged violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). (Doc. 8 at 41-43). Williams presented this argument in his Rule 32 petition. The trial court's findings, which were adopted by the Alabama Court of Criminal Appeals, were as follows:

> Petitioner also alleges his appellate counsel was ineffective for failing to raise the issue of a mistrial based on a <u>Brady</u> violation. In order to show a <u>Brady</u> violation, the defendant must prove (1) the

prosecution's suppression of evidence; (2) the favorable character of the suppressed evidence for the defense; and (3) the materiality of the suppressed evidence. <u>Monroe v. Blackburn</u>, 607 F.2d 148, 150 (5th Cir. 1979) <u>cert. denied</u>, 446 U.S. 957, 100 S. Ct. 2929, 64 L. Ed. 2d 816 (1980). <u>See Moore v. Illinois</u>, 408 U.S. 786, 92 S. Ct. 2562, 33 L. Ed. 2d 706 (1972); <u>Killough v. State</u>, 438 So. 2d 311, 316 (Ala. Cr. App. 1982), rev'd on other grounds, <u>Ex parte Killough</u>, 438 So. 2d 333 (Ala. 1983)." <u>Sexton v. State</u>, 529 So. 2d 1041, 1045 (Ala. Cr. App. 1988). Pursuant to <u>United States v. Bagley</u>, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), undisclosed evidence is material under the <u>Brady</u> rule . . . only where a reasonable probability exists that the outcome of the trial would have been different had the evidence been disclosed to the defense." <u>Hamilton v. State</u>, 520 So. 2d 155, 159 (Ala. Cr. App. 1986), <u>Ex parte Hamilton</u>, 520 So. 2d 167 (Ala. 1987), <u>cert. denied</u>, 488 U.S. 871, 109 S. Ct. 180, 102 L. Ed. 2d 149 (1988).

"Even when there is total nondisclosure of information the test is whether the use of the information at trial would have changed the result by creating a reasonable doubt where one did not otherwise exist. <u>United States v. Agurs</u>, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976); <u>Jones v. State</u>, 396 So. 2d 140 (Ala. Crim. App. 1981). As the United States Supreme Court stated in <u>Beck v. Washington</u>, 369 U.S. 541, 558, 82 S. Ct. 955, 964, 8 L. Ed. 2d 98 (1962):

"'While this Court stands ready to correct violations of constitutional rights, it also holds that it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set

aside, and that it be sustained not as a matter of speculation but as a demonstrable reality.'" <u>Parker v. State</u>, 482 So. 2d 1336, 1340-41 (Ala. Cr. App. 1985). "<u>Brady</u> requires the prosecution to produce evidence that someone else may have committed the crime." <u>See</u> <u>Sellers v. Estelle</u>, 651 F.2d 1074 (5th Cir. 1981).

The evidence complained of by Petitioner is that someone other than himself was detained. However, what Petitioner fails to point out in this section is that the eyewitness viewed this person and said it was not him. There is no evidence that someone else may have committed the crime, only that someone else fit the description of the person seen running from the immediate area. Thus, Petitioner has failed to allege facts which would entitle him to relief. Therefore, counsel cannot be ineffective for failing to raise a claim for which there is no legal basis. <u>See</u> U.S. Const. amend. VI; <u>see</u> <u>also</u> <u>Patrick v. State</u>, 680 So. 2d 959, 963 (Ala. Cr. App. 1996); <u>Hope v. State</u>, 521 So. 2d 1383, 1386 (Ala. Cr. App. 1988).

(Doc. 6, Att. 11 at 72-73).

Following a *de novo* review, the undersigned finds, for the reasons set forth by the state courts, that Williams was not denied effective assistance of appellate counsel because his appellate counsel could not be ineffective for failing to raise a claim for which there was no legal basis. <u>See</u> <u>Reigosa v. U.S.</u>, 2011 WL 346076, *9 (S.D. Fla. 2011). Therefore, his claim thirteen is due to be denied.

K.  Failure of Appellate Counsel to raise Petitioner's
    Challenge of the Admission of the Blood Spatter
    Evidence (Claim Fourteen)

Next, Williams claims that he was denied the right to effective assistance of counsel because his appellate counsel failed to raise for review his challenge to the admission of the blood spatter evidence. (Doc. 8 at 43-46). Williams presented this argument in his Rule 32 petition. The trial court's findings, which were adopted by Alabama Court of Criminal Appeals, were as follows:

> The Petitioner also alleges his appellate counsel was ineffective for failing to raise a challenge to the admission of the blood spatter evidence. Generally, blood-spatter analysis is the process of examining the size, location, and configuration of bloodstains at a crime scene and using the general characteristics of blood to determine the direction, angle, and speed of the blood before it impacts on a surface in order to recreate the circumstances of the crime. See generally Danny R. Veilleux, Annotation, Admissibility in Criminal Prosecution of Expert Opinion Evidence as to "Blood Spatter" Interpretation, 9 A.L.R. 5th 369 (1993), and the cases cited therein.
>
> Blood-spatter analysis is typically used to determine the position of the victim and the assailant at the time of a crime. See Gavin v. State, 891 So. 2d 907, 969 (Ala. Crim. App. 2003). There is no indication in this case that Bill Jones testified to any of the above based on Petitioner's petition. He specifically quotes and/or cites that Bill Jones said that he was not qualified to testify as an expert in this area and

> Petitioner has presented absolutely no facts
> to substantiate his claim that he in fact
> testified regarding blood spatter. Thus,
> Petitioner has failed to plead this
> allegation with specificity. R. 32.6(b).
> Counsel cannot be ineffective for failing to
> raise a claim for which there is no legal
> basis. <u>See</u> U.S. CONST. amend. VI; <u>see also</u>
> <u>Patrick v. State</u>, 680 So. 2d 959, 963 (Ala.
> Cr. App. 1996); <u>Hope v. State</u>, 521 So. 2d
> 1383, 1386 (Ala. Cr. App. 1988).

(Doc. 6, Att. 11 at 73-74).

A thorough review of the record reflects that William (Bill) Jones, the DNA section head with the Department of Forensic Sciences in Mobile, testified as to the identification of the victim's DNA in the blood samples from Williams' clothing, as well as blood spatter evidence. (Doc. 11, Att. 9 at 105). To avoid any confusion, Mr. Jones testified as follows:

> Q. Now, in addition to being a DNA
> scientist, are you also trained as a
> forensic scientist in other fields?
>
> A. Yes.
>
> Q. Okay. And describe if you would for
> the jury the field of blood-spatter
> analysis.
>
> A. Blood spat - blood spatter analysis
> involves the recognition of different kinds
> of blood-spatter patterns and/or stains, and
> the determination on what could have
> originated those patterns or stains, or
> perhaps, where those stains could have
> originated. In other words, a conclusion by
> a blood-spatter analyst may be that a
> pattern is consistent with an object or some
> kind of stain or smear from an action, or a

conclusion could be that a – from a blood-spatter analyst is that a spatter pattern could have originated in a certain location in a room.

Q.  Let me stop you there, Bill.  Before we go into much more about what all you look for, describe for the jury, if you will, your training of blood-spatter and bloodstain analysis.

A.  I've been through two schools, two blood-spatter schools, one of which was a week-long school in 1991 which was sponsored by the Midwestern Association of Forensic Scientists.  This involved hands-on laboratory work.  I would consider it laboratory work.  As in we actually made spatter patterns and observed spatter patterns being made by objects with objects using energy, using gunshots, using practically any way we could think of to make different patterns on specific targets and make observations of those.

Q.  What do you mean you made spatter yourself?  How did you do that?

A.  Since you can't use living victims or living people to – as your subjects, you must get objects or items that are similar or can be similar or can be used to at least observe what is possible and what is not possible.  Bloody sponges are often used.  We get Red Cross blood or some – in this school we drew our – some of us drew our own blood and used that to bloody clothes, sponges, items to smash, sling.  One individual even used his own blood to cough blood to see what that would – to show us what that would look like.

Q.  So did you receive any certifications from that training?

A.  Yes.

Q.  And describe that for the jury.

A.  Well, the completion of that was a – was a practical exam at the end of the training which involved a crime scene.  And we all passed those practical exams at the blood-spatter training.

Q.  Have you received additional training since then?

A.  Yes.  The Southern Association of Forensic Scientists has – occasionally puts on blood-spatter workshops and training and I've been through one of those as well.  It was not a week-long training, but it was a – I believe it was a two-day training in 1997.

Q.  Have you taught blood-spatter analysis to other forensic scientists also?

A.  As part of the training with the DNA analysts in our section in the Mobile laboratory, their minimum training requires that they be able to observe and recognize basic bloodstain patterns and stains.  And, yes, I have trained them and spent a period of time with them splashing, smashing blood to demonstrate and show what it looks like on targets.

Q.  And are you currently certified in that field?

A.  I have no American Board Criminalistics certified – certification in that.  I'm not sure that the American Board of Criminalistics certifies blood-spatter—

Q.  Is –

A.  –analysts.

Q.  –blood-spatter analysis routinely used by other DNA laboratories in the United States and around the world?

A.  Yes, it is.  There are some laboratories that do not do – work crime scenes, and there may not be scientists that actually –

Q. But in those –

A. –make those—

Q. –that do work crime scenes, is it commonly used and accepted?

A. Yes.

Q. And are the test procedures and the observations that you have relied on , are they commonly accepted in the scientific community of experts in this field?

A. Yes, it is.

Q. In fact, are there scholarly treatise, in fact whole books that have been written on blood-spatter and bloodstain analysis?

A. Yes. Books, I know graduate theses and perhaps dissertations on the physics of blood-spatter events that have been done, yes.

. . . .

Q. Have you been allowed to testify in courts in Alabama on the field of blood spatter?

A. Yes, I have.

Q. And on approximately how many occasions have you been allowed to so testify?

A. I would say approximately fifteen to twenty times.

. . . .

THE COURT: I think the blood-spatter analysis has been accepted as a scientific principle in this country and in this state as a technique, and I think it's accepted. I think the prosecution has laid the proper foundation, and I will accept Mr. Jones as an expert on this subject to testify further.

(Doc. 11, Att. 9 at 129-135). Mr. Jones went on to testify as to his opinion regarding the drops of the victim's blood on Williams' clothing, and as to the manner in which those drops might have landed on his clothing. (Id. at 135-156). Williams argues that this witness' testimony was in violation of Daubert and Frye, and that his appellate counsel was ineffective for failing to raise this issue on appeal. The undersigned disagrees.

Regarding the proper admission of expert testimony, the Supreme Court in Daubert set out a list of "general observations" for determining whether expert testimony is sufficiently reliable to be admitted under Federal Rules of Evidence 702. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593, 113 S. Ct. 2786, 2796, 125 L. Ed. 2d 469 (1993). "Those general observations focus on four primary inquiries about the expert's theory or technique: (1) whether it can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field." U.S. v. Brown, 415 F.3d 1257, 1267 (11th Cir. 2005) (citing Daubert, 509 U.S. at 593-94). The Daubert Court emphasized that the inquiry is to be a "flexible" one. Id. The older Frye test looked at whether the expert's theory or technique was "generally

accepted" in determining admissibility. <u>Daubert</u>, 509 U.S. at 589 (citing <u>Frye v. United States</u>, 54 App. D.C. 46, 293 F. 1013 (1923).

Following a thorough review of the record in this matter, this Court is satisfied that Williams was not denied the effective assistance of appellate counsel as to this issue. As noted previously, appellate counsel could not be ineffective for failing to raise a claim for which there was no legal basis. <u>See</u> <u>Reigosa v. U.S.</u>, 2011 WL 346076, *9 (S.D. Fla. Jan. 4, 2011). Furthermore, even if the State's expert improperly testified as to blood spatter, he had already testified to the DNA connection between the victim's blood and Williams' clothing – testimony which Williams does not challenge here. This evidence without any testimony concerning blood spatter was enough to tie Williams to the murder. Therefore, Williams' claim fourteen is due to be denied.

L. <u>Failure of Appellate Counsel to Raise for Review Petitioner's Request for Mistrial based on Introduction of Inflammatory/Prejudicial Photographs (Claim Fifteen)</u>

Finally, Williams alleges that he was denied effective assistance of counsel because his appellate counsel failed to raise for review his request for a mistrial based on the introduction of inflammatory and prejudicial photographs. (Doc. 8 at 46-48). Williams presented this argument in his Rule 32

petition. The trial court's findings, which were adopted by Alabama Court of Criminal Appeals, were as follows:

> Finally, Petitioner alleges his appellate counsel was ineffective for failing to raise on appeal the admission of inflammatory prejudicial photographs. Again, this allegation is without merit. "It has long been the law in Alabama that photographs which show external wounds in the body of a deceased victim, even though they are cumulative and based on undisputed matters, are admissible. The fact that they are gruesome is not grounds to exclude them so long as they shed light on the issues being tried." See Burton v. State, 521 So. 2d 91, 92 (Ala. Cr. App. 1987); see also Kinder v. State, 515 So. 2d 55 (Ala. Cr. App. 1986).
>
> The fact that a photograph is gruesome and ghastly is no reason to exclude it from the evidence, so long as the photograph has some relevancy to the proceedings, even if the photograph may tend to inflame the jury. See Magwood v. State, supra, 494 So. 2d at 141. See also Hutto v. State, 465 So. 2d 1211 (Ala. Cr. App. 1984); Jones v. State, 439 So. 2d 776 (Ala. Cr. App. 1983); Godbolt v. State, 429 So. 2d 1131 (Ala. Cr. App. 1982). Thus, Counsel cannot be ineffective for failing to raise a claim for which there is no legal basis. See U.S. CONST. amend. VI; see also Patrick v. State, 680 So. 2d 959, 963 (Ala. Cr. App. 1996); Hope v. State, 521 So. 2d 1383, 1386 (Ala. Cr. App. 1988).

(Doc. 6, Att. 11 at 74).

Following a complete review of the record, the undersigned finds that there was no legal basis for a claim to be raised regarding the admission of the photographs of the victim.

"Generally, photographs are admissible into evidence in a criminal prosecution 'if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.'" <u>Bankhead v. State</u>, 585 So. 2d 97, 109 (Ala. Crim. App. 1989), remanded on other grounds, 585 So. 2d 112 (Ala. 1991), aff'd on return to remand, 625 So. 2d 1141 (Ala. Crim. App. 1992), rev'd, 625 So. 2d 1146 (Ala. 1993), quoting <u>Magwood v. State</u>, 494 So. 2d 124, 141 (Ala. Crim. App. 1985), aff'd, 494 So. 2d 154 (Ala. 1986). "Photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome." <u>Williams v. State</u>, 506 So. 2d 368, 371 (Ala. Crim. App. 1986) (citations omitted). In addition, "photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors." <u>Ex parte Siebert</u>, 555 So. 2d 780, 784 (Ala. 1989). 'This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim's injuries.' <u>Ferguson v. State</u>, 814 So. 2d 925, 944 (Ala. Crim. App. 2000), aff'd, 814 So. 2d 970 (Ala. 2001). " '[A]utopsy photographs depicting the character and location of wounds on a victim's body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter." ' <u>Jackson v. State</u>, 791 So. 2d 979, 1016 (Ala. Crim. App. 2000), quoting <u>Perkins v. State</u>, 808 So. 2d 1041, 1108 (Ala. Crim. App. 1999), aff'd, 808 So. 2d 1143 (Ala. 2001), judgment vacated on other grounds, 536 U.S. 953, 122 S. Ct. 2653, 153 L. Ed. 2d 830 (2002), on remand to, 851 So. 2d 453 (Ala. 2002)."

McCray v. State, 2010 WL 5130747, *54 (Ala. Crim. App. 2010) (quoting Brooks v. State, 973 So. 2d 380, 393 (Ala. Crim. App. 2007).

Appellate counsel for Williams cannot be deemed ineffective for failing to appeal an issue for which there was no legal basis. See Reigosa v. U.S., 2011 WL 346076, *9 (S.D. Fla. Jan. 4, 2011) ("Trial counsel, therefore, did not render constitutionally ineffective assistance when he failed to raise the now-presented non-meritorious challenges to the career offender sentence or prior state court conviction."). See also Knowles v. Mirzayance, __ U.S. __, 129 S. Ct. 1411, 1420-22 (2009) (stating that Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success). Therefore, Williams' claim fifteen is due to be denied.

The Court further notes that the state trial court, in denying Williams' petition, stated the following at the conclusion of its order:

> This Court additionally finds that both Petitioner's trial and appellate counsel were effective and vigorously defended Petitioner and his rights. Petitioner's trial counsels combined experience throughout this matter in fact resulted in Petitioner receiving a life without sentence versus the death penalty.

(Doc. 6, Att. 11 at 74).

Pursuant to Rule 11(a) of the Rules Governing § 2254 Proceedings, the undersigned recommends that a certificate of appealability in this case be denied. 28 U.S.C. foll. § 2254, Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). The habeas corpus statute makes clear that an applicant is entitled to appeal a district court's denial of his habeas corpus petition only where a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1). A certificate of appealability may issue only where "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a habeas petition is being denied, in part, on procedural grounds without reaching the merits of an underlying constitutional claim, "a COA should issue [only] when the prisoner shows . . . that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Where a habeas petition is being denied on the merits of an underlying constitutional claim, as herein, a certificate of appealability should issue only when the petitioner demonstrates "that reasonable jurists would find

the district court's assessment of the constitutional claims debatable or wrong." Id. ("To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under Barefoot [v. Estelle, 463 U.S. 880, 893 (1983)], includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.") (internal quotation marks omitted); accord Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).

None of Williams' claims would warrant the issuance of a Certificate of Appealability in this case. As previously discussed, Williams' claims of violations of Miranda, Illinois v. Gates, as well as being convicted based on insufficient evidence are meritless claims. Further, his claims of ineffective assistance of trial and appellate counsel lack merit pursuant to Strickland v. Washington, 466 U.S. 668 (1984). Thus, reasonable jurists could not debate whether the merits of any of Williams' claims should be resolved in a different manner or whether the issues deserve to proceed further. The recommendation that these claims be denied is based on the straightforward application of clear Circuit precedent, and no reasonable jurist could differ on the appropriate disposition of

the claims on the record presented.  It is thus recommended that the Court deny any request for a Certificate of Appealability.

Rule 11(a) further provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation. *See,* Bass v. Price, 2011 U.S. Dist LEXIS 51112 (S.D. Ala. Mar. 28, 2011)(providing for same procedure)(citations omitted).

CONCLUSION

Based on the foregoing, the undersigned Magistrate Judge is of the opinion that Williams' rights were not violated and that his request for habeas corpus relief should be denied.  The undersigned further finds that Williams is not entitled to a certificate of appealability and therefore, he is not entitled to appeal *in forma pauperis*. It is so recommended.

The instructions which follow contain important information regarding objections to the report and recommendation of the Magistrate Judge.

DONE this the **24th** day of **May, 2011.**

                **/s/SONJA F. BIVINS**_____
                **UNITED STATES MAGISTRATE JUDGE**

## MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
## AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
## AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1. _Objection_. Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court. Failure to do so will bar a de novo determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge. _See_ 28 U.S.C. § 636(b)(1)(C); _Lewis v. Smith_, 855 F.2d 736, 738 (11th Cir. 1988). The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days[7] after being served with a copy of the recommendation, unless a different time is established by order. The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection. The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made. It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection. Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

---

[7] Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]" _Fed. R. Civ. P._ 72(b)(2).

2.   <u>Opposing party's response to the objection</u>.   Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection. Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.   <u>Transcript (applicable where proceedings tape recorded)</u>. Pursuant to 28 U.S.C. § 1915 and Fed. R. Civ. P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.   Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.